IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

WENDALL N. SAMPSON, JR.                                             PLAINTIFF

v.                                    No. 2:15-CV-02251

CITY OF FORT SMITH, ARKANSAS; CARL
GEFFKEN; KEVIN LINDSEY; JARRARD COPELAND;
LEVI RISLEY; MARK HALLUM; DEAN PITTS;
ANTHONY BOWERS; DOUG BROOKS; DANIEL
GRUBBS; AUSTIN COLLINS; and DAWN
SPRAYBERRY                                                         DEFENDANTS

## OPINION AND ORDER

Before the Court is Defendants' motion for summary judgment (Doc. 49), Plaintiff

Wendall N. Sampson, Jr.'s response (Doc. 54), Defendants' reply (Doc. 56), and the parties'

supporting documents. For the reasons set forth herein, Defendants' motion for summary

judgment will be granted.

**I.      Background**[1]

Officer Sampson is an African-American officer who has been employed by the Fort Smith

Police Department since 1995. His career in the department consists of working first for four years

in the patrol division; then in narcotics for several months, the criminal investigations division for

---

[1] Defendants' motion for summary judgment includes approximately 850 pages of
evidence as support, and their statement of facts contains 111 paragraphs. In response, Officer
Sampson has included two affidavits totaling five pages that primarily seek to call into question
the credibility of certain Defendants. His response to Defendants' statement of facts relies upon
these two affidavits and arguments raised in his responsive brief in summarily concluding that
these documents adequately controvert the vast majority of Defendants' factual submissions. To
the extent that Officer Sampson has relied on speculation, denials, or allegations, without a proper
basis in fact or clear citation to facts already in the record, the Court will view such facts as
undisputed. Fed. R. Civ. P. 56(e)(2). To the extent they are relevant, facts not specifically
controverted by Officer Sampson will be deemed to have been admitted. Local Rule 56.1. Where
Officer Sampson has complied with Rule 56(c)(1)(A) and supported his argument with citation to
materials in the record, the Court has made all inferences in his favor.

eight years, and the community relations division for two years; then as an airport liaison for two years and an assistant communications center supervisor[2] for four years; and currently as the information desk officer. He holds the rank of corporal, which is an automatic promotion after an officer attains ten years of experience. (Doc. 54, p. 2).

In his second amended complaint (Doc. 26), Officer Sampson asserts that each Defendant violated Title VII of the Civil Rights Act of 1964 by discriminating against him on the basis of his race and by retaliating against him for engaging in protected activity. In particular, Officer Sampson asserts that Defendants discriminated against him by investigating and disciplining him when white officers were not investigated for the same conduct, and by failing to promote him but promoting similarly- or less-qualified white officers. Officer Sampson also asserts that the investigations into him were retaliation for his general complaints about racial discrimination and harassment, and that he was subjected generally to harassment, suspension, and transfer on the basis of his general complaints and for filing an April 2013 internal grievance and an October 2013 discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). Officer Sampson filed an EEOC charge on the basis of racial discrimination and retaliation in April 2015. In addition to his Title VII claims, Officer Sampson asserts claims under 42 U.S.C. § 1983 for Defendants' deprivation of Officer Sampson's 42 U.S.C. § 1981 rights[3] and for retaliation against

---

[2] The position appears to properly be titled "Assistant Communications Center Supervisor," but the parties' filings have also referred to it as "Assistant Radio Room Supervisor."

[3] To the extent Officer Sampson has attempted to assert a separate § 1981 claim, that claim fails. A claim under 42 U.S.C. § 1983 is the sole remedial provision for an action "brought against state actors alleging violation of the rights declared in § 1981." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989). Furthermore, no claim could be had against any of the Defendants in his or her individual capacity because none but the City was Officer Sampson's employer, and only his employer could have deprived him of both reputation and an employment interest. *Accord Jones v. McNeese*, 746 F.3d 887, 898 (8th Cir. 2014) (explaining that in the analogous § 1983 context, injury to reputation is insufficient to state a claim unless it is coupled to a more tangible interest like employment).

him for his speech protected by the First Amendment. Finally, Officer Sampson brings a discrimination claim under the Arkansas Civil Rights Act ("ACRA"), Ark. Code § 16-123-101 et seq., based on the same damage to his employment and reputation.

In 2015, the year Officer Sampson filed this lawsuit, the Fort Smith Police Department had 165 total officers. *See* http://www.fortsmithpd.org/Assets/2015AnnualReport.pdf, last accessed May 8, 2017. At that time and for approximately seven years prior, Officer Sampson was the sole African-American officer in the entire department. Officer Sampson alleges that he was only the tenth African-American officer hired by the department in its entire history, and that no African-American officer has been promoted since 1988. On the basis of 2012 and 2013 examination scores, he applied for promotion but was not chosen.[4]

In April 2013, Officer Sampson filed a formal complaint against Sergeant Dawn Sprayberry with then-Chief Kevin Lindsey. In the formal complaint, Officer Sampson accused Sergeant Sprayberry of "harassment/creating a hostile work environment" and "vengeful retaliatory bullying" against Officer Sampson, CALEA Communications Accreditation Manager Rhonda Harper, and "other members of the department." (Doc. 49-11, p. 15). The formal complaint listed a wide range of grievances against Sergeant Sprayberry stemming from the way in which she treated individuals in the department. It recalled Officer Sampson's previous duties as an assigned recruiter for minority officers and an incident in which an African-American applicant, Tiffany Johnson, who Officer Sampson stated was "#1 on our hire list before failing her final interview." (*Id.* p. 18). Officer Sampson claimed Sergeant Sprayberry docked Ms. Johnson points because Ms. Johnson had expressed interest in joining the United States Marshal's Service.

---

[4] Officer Sampson also applied for promotion in 2015 and was not chosen, but he has not argued that the failure to promote based on the 2015 scores supports a claim of discrimination.

(*Id*.).  The formal complaint also alleged that Sergeant Sprayberry "could possibly have manipulated the results" of Officer Sampson's oral presentation score as part of his 2012 promotional testing.  (*Id*.).  At no point did Officer Sampson's formal complaint mention race as a basis for Sergeant Sprayberry's objectionable actions, or ascribe them any basis other than her general disdain for others.

On April 16, 2015,[5] Officer Sampson filed a charge of discrimination with the EEOC alleging racial discrimination or harassment.  This charge was amended on May 28, 2015, after meeting with the EEOC investigator.  On August 27, 2015, the EEOC issued a right to sue letter. Following the filing of the April 2013 formal complaint against Sergeant Sprayberry and the October 2013 EEOC discrimination charge, Officer Sampson claims that Defendants retaliated against him by unjustly making him the target of a number of internal investigations when, prior to the filing of his formal complaint against Sergeant Sprayberry in April of 2013, he had been the subject of only one sustained complaint during eighteen-plus years of employment by the department.  Officer Sampson primarily bases his discrimination and retaliation claims on the internal investigations opened against him subsequently to his April 2013 formal complaint and October 2013 EEOC charge, and on Defendants' failure to promote him based on his 2012 and 2013 examination scores.  Officer Sampson also alleges that he did not receive an increase in pay

---

[5] Defendants accept this date for the purposes of the instant motion.  Though the EEOC charge presumably was produced during discovery, neither party has filed a copy of the EEOC charge with the Court.  Had either party done so, the Court would be in a better position to evaluate Defendants' argument that Officer Sampson is time-barred for recovering on acts of discrimination or retaliation occurring more than 180 days before the charge.  Though it is almost certainly the case that many of the allegedly unlawful actions are time-barred, because the charge may have alleged a continuing course of conduct (and at any rate because incidents from before the statute of limitations can still be probative of whether timely claims were premised on discriminatory acts), on this motion the Court will address Officer Sampson's claims on the merits and will not analyze Defendants' statute of limitations argument any further.

for his tenure as Assistant Communications Center Supervisor, even though one was allowed.  (*Id.*, ¶ 32).[6]

As part of his failure to promote claim, Officer Sampson contends that he is qualified for a promotion and applied for a promotion to Sergeant based on his 2012 and 2013 examination scores, but that the department instead hired or promoted individuals who were not members of a protected group who were similarly qualified to or less qualified than Officer Sampson.  The Fort Smith Police Department employs both an objective and subjective component to its promotional testing. Officers must take an objective multiple choice exam.[7]  They then undergo an oral examination before five panelists, with both the top and the bottom scores given being discarded.  The objective

---

[6] As additional evidence of racial discrimination and harassment, Officer Sampson's second amended complaint points to: (1) Chief Lindsey allegedly sustaining the complaint against Sergeant Sprayberry but "order[ing] the records of the complaint and discipline destroyed" (Doc. 26, ¶ 33); (2) Chief Lindsey asking Officer Sampson to leave a sworn officers' meeting because he was "a plaintiff in a lawsuit," even though there was no discussion of the lawsuit after Officer Sampson left (*Id.*, ¶ 52); (3) City Administrator Ray Gosack finding Chief Lindsey's aforementioned actions to be appropriate after Officer Sampson filed a grievance against the Chief (*Id.*, ¶ 53);  (4) Officer Austin Collins commenting on Facebook in a profane and threatening nature about a pending disciplinary action against Officer Sampson (*Id.*, ¶ 42); (5) Captain Jarrard Copeland determining that Officer's Collins' post was protected free speech and closing the investigation into the matter after Officer Sampson filed a complaint (*Id.*); (6) a Facebook profile under the name "Bennie Taddler" that Officer Sampson claims made disparaging comments about him and contained information that "could only have come from the FSPD Office of Professional Standards," and based on which no one was disciplined  (*Id.*, ¶¶ 61-63); (7) Captain Copeland taking screenshots of Officer Sampson's Facebook page even though there was no open investigation (*Id.*, ¶ 45); (8) Captain Copeland and Detective Gregory Smithson questioning Officer Sampson about his attorney's knowledge of FIOA requests and then about his Facebook postings (*Id.*, ¶ 54);   and (9) Major Mark Hallum refusing to reschedule a pre-determination hearing by one day after Officer Sampson requested such so that his attorney could attend even though it could have been rescheduled and they were routinely rescheduled for white officers upon request (*Id.*, ¶¶ 38-41).   However, because Officer Sampson has not produced any evidence supporting these additional allegations, the Court will disregard them for purposes of ruling on the motion for summary judgment.  See *P.H. v. Sch. Dist. of Kan. City, Mo.*, 265 F.3d 653, 657 (8th Cir. 2001) ("The facts asserted… must be properly supported by the record.") (citation omitted).

[7] The affidavit of Sergeant Wayne Barnett suggests that the objective examination is subject to manipulation, with higher-ranking officers providing the answers ahead of time to some, but not all, white corporals so that they are more likely to be promoted.  (Doc. 54-2, ¶ 4).

and subjective component scores are then combined, and each officer is ranked according to his or her overall performance. Under the "Rule of Three," when a position is open, the Chief of Police can select any of the three top-scoring candidates. In 2012, Officer Sampson ranked fourth out of twelve, with just 0.17 of one point separating him from the third-ranked scorer. In 2013, Officer Sampson also ranked fourth out of twelve, with one point separating him from the third-ranked scorer.

Officer Sampson's § 1983 and ACRA claims allege that he was deprived of his reputation and employment without due process or equal protection as required by the Fourteenth Amendment, and that Defendants retaliated against him for making antidiscrimination complaints, violating his First Amendment rights.

The Court previously dismissed without prejudice Officer Sampson's illegal exactions claim, declining to exercise supplemental jurisdiction over the unrelated state law claim. (Doc. 39). The claims against Separate Defendants Colby Roe and Wyman Wade were dismissed by the same order (*Id.*), and individual capacity claims against former City Administrator Ray Gosack were subsequently dismissed after no motion to substitute was filed within 90 days of the filing suggesting his death. (Doc. 47).

Defendants filed the instant motion for summary judgment, arguing that each of Officer Sampson's claims fail under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). They argue that Officer Sampson has not made out a prima facie case for any of his claims, and that even if he had done so, the Defendants have provided legitimate reasons for each of their actions that Officer Sampson cannot prove as pretext. Defendants additionally argue that they are entitled to judgment based on qualified immunity, claim

preclusion, statute of limitations grounds, and because Officer Sampson has not shown a custom or policy as part of his § 1983 claims.

## II.      Legal Standard

When a party moves for summary judgment, it must establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). In order for there to be a genuine issue of material fact, the nonmoving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66–67 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Only facts "that might affect the outcome of the suit under the governing law" need be considered. *Anderson*, 477 U.S. at 248. "[T]he non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof." *Sch. Dist. of Kan. City, Mo.*, 265 F.3d at 658 (quotation omitted). Facts asserted by the nonmoving party "must be properly supported by the record," in which case those "facts and the inferences to be drawn from them [are viewed] in the light most favorable to the nonmoving party." *Id.* at 656–57. These specific facts showing a genuine issue for trial are to be established by "citing to particular parts of materials in the record… or showing that the materials cited do not establish the absence or presence of a genuine dispute[.]" Fed. R. Civ. P. 56(c). "[A] lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate nor district courts are obliged in our adversary system to scour the record looking for factual disputes…" *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (citation and internal quotations omitted). Ultimately, "[w]hile employment discrimination cases are often fact intensive

and dependent on nuance in the workplace, they are not immune from summary judgment, and there is no separate summary judgment standard for employment discrimination cases." *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010) (rejecting prior assertions that summary judgment should rarely be granted in employment discrimination cases).

## III.    Discussion

### A.    Applicable Law

With the exception of his § 1983 First Amendment retaliation claim,[8] all of Officer Sampson's discrimination and retaliation claims will be analyzed under the burden-shifting *McDonnell Douglas* framework. *See Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 856 (8th Cir. 2012) (applying *McDonnell Douglas* to a Title VII retaliation claim); *Richmond v. Bd. of Regents of Univ. of Minnesota*, 957 F.2d 595, 598 (8th Cir. 1992) (applying *McDonnell Douglas* for discrimination claims under §§ 1981 and 1983); *Greenlee v. J.B. Hunt Transp. Servs.*, 342 S.W.3d 274, 277–79 (Ark. 2009) (applying *McDonnell Douglas* to discrimination claims brought under the ACRA); *Brodie v. City of Jonesboro*, 2012 WL 90016, *2 (Ark. Jan. 12, 2012) (unreported) ("This court has previously applied the *McDonnell Douglas* framework in reviewing the grant of a summary-judgment motion in an employment-discrimination case, . . . and Brodie fails to provide convincing argument that would cause us to reconsider our use of the framework." (citation omitted)).

---

[8] Because he was a public employee, Officer Sampson's First Amendment retaliation claim will be analyzed using the framework set out by the Supreme Court for such claims. *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

### B. Disparate Treatment

A plaintiff in an employment discrimination case survives a motion for summary judgment "either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination" using circumstantial evidence. *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012). When, as is the case here, a plaintiff presents no direct evidence to support a claim of discrimination, the claim is analyzed under the burden shifting framework set out in *McDonnell Douglas*. Under this framework, the plaintiff must first present a prima facie case of employment discrimination. *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1153 (8th Cir. 2007). Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.*; *McDonnell Douglas Corp.*, 411 U.S. at 802. If the defendant can do so, the plaintiff must then demonstrate that the defendant's proffered reason is pretext for unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993); *Miners v. Cargill Comms., Inc.*, 113 F.3d 820, 823 (8th Cir. 1997). To meet this burden, the plaintiff must offer sufficient evidence for a reasonable trier of fact to infer discrimination was the more likely reason for the adverse employment decision. *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010). "[T]he evidence produced to show a prima facie case and the 'inferences drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual.'" *Miners*, 113 F.3d at 823 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n. 10 (1981). Although the burden of production shifts between the parties, the burden of persuasion remains on the plaintiff at all times. *Fatemi v. White*, 775 F.3d 1022, 1041 (8th Cir. 2015).

To establish a prima facie case of unlawful race discrimination under Title VII, a plaintiff must show that: "(1) he is a member of a protected class, (2) he was meeting his employer's

legitimate job expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside the protected class were treated differently." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007) (citations and quotations omitted). Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Ramlet v. E.F. Johnson Co.,* 507 F.3d 1149, 1153 (8th Cir. 2007); *McDonnell Douglas Corp.*, 411 U.S. at 802. The plaintiff must then demonstrate that the defendant's proffered reason is a pretext for unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993); *Miners v. Cargill Comms., Inc.*, 113 F.3d 820, 823 (8th Cir. 1997). To do this, "a plaintiff may show that the employer's explanation is "unworthy of credence... because it has no basis in fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011). Alternatively, a plaintiff may show pretext "by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action. *Id.*

### 1. Prima Facie Case

Officer Sampson has pointed to four adverse employment decisions: (1) the actions outlined in the formal complaint he filed against Sergeant Sprayberry; (2) Defendants' investigations and discipline of Officer Sampson; (3) Defendants' decision not to promote Officer Sampson on multiple occasions; and (4) Defendants' decision not to increase Officer Sampson's pay when he served as the Assistant Communications Center Supervisor.

### a. Allegations in the Complaint Against Sergeant Sprayberry

As an initial matter, the Court will address Officer Sampson's discrimination claims based on his April 2013 formal complaint filed with Chief Lindsey against Sergeant Sprayberry. Even if

a case based on the matters set out in that formal complaint were not time-barred, it would fail because it does not make out a prima facie case of unlawful discrimination. Officer Sampson's complaint describes the April 2013 formal complaint as stating "that he and certain other third-party applicants to the FSPD were being harassed and/or discriminated against on the basis of race." (Doc. 26, ¶ 94). Having reviewed the formal complaint, the Court concludes that Officer Sampson's formal complaint is not evidence of racial discrimination or harassment because it is completely devoid of any allegation of discrimination or harassment on the basis of race. (Doc. 49-11, pp. 15-19). Officer Sampson's formal complaint primarily lists grievances against Sergeant Sprayberry for the rude manner in which she treated a wide range of employees, but "[i]t is well-settled in this circuit that ostracism and rudeness by supervisors and co-workers do not rise to the level of an adverse employment action." *Gagnon v. Sprint Corp.*, 284 F.3d 839, 850 (8th Cir. 2002). Further, discussion about Ms. Johnson, the minority applicant who was docked points for having an interest in joining the U.S. Marshals Service, is the only part of the grievance that might even imply racial discrimination, but that disparate treatment would have been targeted at Ms. Johnson and not Officer Sampson. The April 2013 formal complaint does not reveal any adverse employment action for which similarly situated employees outside the protected class were treated differently than Officer Sampson. As a result, the formal complaint against Sergeant Sprayberry does not establish a prima facie case premised on the actions then complained of.

### b. Investigations and Discipline

In their motion for summary judgment, with respect to disparate treatment claims premised on investigation and discipline, Defendants primarily take issue with the fourth factor of the prima facie case analysis, claiming that Officer Sampson cannot find a "similarly situated" employee who was treated differently. This test is "rigorous and requires that the other employees be

similarly situated in all relevant aspects before the plaintiff can introduce evidence comparing herself to the other employees." *Fields v. Shelter Mut. Ins. Co.,* 520 F.3d 859, 864 (8th Cir. 2008). To the extent he relies on differently-treated comparators, Officer Sampson "bears the burden to demonstrate by a preponderance of the evidence that there were individuals similarly situated." *Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003) (citing *Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir. 2000)). A comparator typically "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* However, "[t]he similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Doucette v. Morrison Cty., Minn.*, 763 F.3d 978, 984 (8th Cir. 2014) (citing *Ridout v. JBS USA, LLC,* 716 F.3d 1079, 1085 (8th Cir. 2013)) (quotations omitted).

Defendants argue that Officer Sampson has only offered one comparator—Officer Dayton Leavitt[9]—and only for one of the alleged adverse employment decisions—the decision to investigate a citizen complaint against Officer Sampson. Defendants argue that Officer Leavitt was not similarly situated to Officer Sampson because Officer Leavitt did not engage in the same conduct without any mitigating or distinguishing circumstances. Officer Sampson contends that one citizen was unhappy on two separate occasions with police reports written by Officer Leavitt and Officer Sampson, respectively, but that an investigation was only opened against Officer Sampson and not against Officer Leavitt. Defendants respond that the circumstances were different because the citizen had not claimed that Officer Leavitt intentionally falsified his report

---

[9] The Court notes that Officer Sampson has not explicitly offered anyone as a comparator, but agrees with Defendants that Officer Leavitt appears to be the likeliest candidate. Officer Sampson's second amended complaint includes a number of allegations from which additional comparators could potentially be found, but in the absence of any evidence supporting these allegations, the Court will not consider them at the summary judgment stage.

and did not seek to file a complaint against him, but that the inverse was true with Officer Sampson—the citizen claimed Officer Sampson intentionally falsified his report and did seek to file a complaint against Officer Sampson.  Defendants argue that the department was required to investigate all formal complaints lodged by members of the public.

Officer Sampson does not directly respond to the arguments regarding Officer Leavitt, and the Court must therefore agree with Defendants that Officer Leavitt is not sufficiently similarly situated for purposes of Officer Sampson's prima facie case.  Officer Sampson instead contends that because he was the only African-American officer in the department, "there is inherently a racial component to any action taken against Plaintiff, and the mere fact that white officers may have experienced a similar result does not remove the taint of racism that undergirds any action where Plaintiff was treated differently…"  (Doc. 54, p. 6).  Citing *Kirby v. Colony Furniture Co*., 613 F.2d 696 (8th Cir. 1980), Officer Sampson correctly asserts that a sufficient racial disparity can, in extreme cases, constitute sufficient evidence of racial bias to give rise to an inference of unlawful discrimination and establish a prima facie case.  *See also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307 (1977) ("[S]tatistics can be an important source of proof in employment discrimination cases… Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.").

The Court agrees that the Fort Smith Police Department's long record of failing to hire, promote, or retain African-American officers is probative of discrimination.  The Fort Smith Police Department only employed one black officer out of approximately 165 total officers for the eight years preceding this lawsuit, and Officer Sampson was only the tenth African-American officer in the department's entire existence.  A casual review of the demographics of this community leaves the Court with the impression that African-American representation in the Fort Smith Police

Department is disproportionately low. With the exception of automatic "seniority" promotions, no African-American had been promoted in almost two decades prior to Officer Sampson's lawsuit. This, too, is probative of racial discrimination.

Still, without a comparator, in order to meet his prima facie burden Officer Sampson must do more than simply point out that he is the only black officer in the department and no black officers have been promoted. *See Clayborne v. Omaha Pub. Power Dist.*, 211 F.R.D. 573, 592 (D. Neb. 2002) (quoting *Wagner v. Taylor*, 836 F.2d 578, 593 (D.C. Cir. 1987)) ("Statistics laying bare a racially unbalanced workforce do not make out a prima facie case of disparate treatment absent further evidence drawing comparisons with the relevant labor market. Much less do they show a policy of discrimination manifested in the employer's promotional practices."). Officer Sampson's general statistical argument does not carry his burden because it only lays bare a racially unbalanced workforce inside the Fort Smith Police Department and does not demonstrate that the unbalance is tied to discrimination.

When relying on an unbalanced racial composition to establish a prima facie case of workplace discrimination, a plaintiff must typically compare the racial composition of employees in the workplace with that of the qualified population in the relevant market. *Id*. at 308. The "probative worth of statistical evidence depends on all of the surrounding facts and circumstances." *Inmates of Nebraska Penal & Corr. Complex v. Greenholtz*, 567 F.2d 1368, 1375 (8th Cir. 1977) (citation omitted). "To be legally sufficient, [Officer Sampson's] statistical evidence must show a disparity of treatment, eliminate the most common nondiscriminatory explanations of the disparity, and thus permit the inference that, absent other explanation, the disparity more likely than not resulted from illegal discrimination." *Morgan v. United Parcel Serv. of Am., Inc*., 380 F.3d 459, 463–64 (8th Cir. 2004); *see also Hazelwood Sch. Dist*., 433 U.S. at 299

("What the [employment] figures prove obviously depends upon the figures to which they are compared."). Officer Sampson bears the burden of producing admissible evidence that gives rise to an inference of unlawful discrimination. Because he does not rely on any materials in the record other than an inadequate comparator (for only one of the adverse employment decisions) and general statistics describing the racial composition of the Fort Smith Police Department, Officer Sampson has not met his burden of proof on summary judgment and cannot establish a prima facie case under the *McDonnell Douglas* shifting framework.

### c. Failure to Promote

In his Title VII claim of racial discrimination arising out of the Fort Smith Police Department's failure to promote him, Officer Sampson alleges that he applied for a promotion to Sergeant based on his 2012 and 2013 examination scores, but that the department instead hired or promoted individuals who were not members of a protected group or with similar qualifications. "To establish a prima facie case of discriminatory failure to promote, a Title VII plaintiff must demonstrate that: (1) he is a member of a protected group; (2) he was qualified and applied for a promotion to an available position; (3) he was rejected; and (4) a similarly qualified employee, not part of a protected group, was promoted instead." *Brown v. Missouri State Highway Patrol*, 56 F. App'x 282, 284 (8th Cir. 2003). Officer Sampson is a member of a protected group, he was rejected promotion on all three attempts, and in each instance employees who were not part of a protected group were instead promoted. As for the fourth factor, the Court notes that numerous white officers also were not promoted, which to some extent undermines the strength of any inference of discrimination resulting from the similarly-situated comparator analysis. Nevertheless, the Court concludes that Officer Sampson has demonstrated that he was "similarly qualified" to the individuals promoted on the basis of both 2012 and 2013 examination scores.

In both years, Officer Sampson finished fourth out of twelve applicants. Under the "Rule of Three," Chief Lindsey could promote any of the top three scoring candidates when a position became open. For both 2012 and 2013 examinations, after the first promotion was made Officer Sampson technically moved into the top three scorers and thus could have been promoted to any subsequently-opened position. Yet, in each year, other individuals in the top three of available scorers were promoted instead. This is sufficient to show that Officer Sampson was "similarly qualified" to individuals who were not part of a protected group and were instead promoted. The burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for not promoting Officer Sampson.

### d. Failure to Increase Pay

Officer Sampson argues that during his tenure as Assistant Communications Center Supervisor he was entitled to an increase in pay but was not given one. He alleges that Fort Smith Police Department policy specifically allows for officers who hold the position to be given an increase in pay, and that "white officers who are in specialized positions such as this one routinely receive this higher rate of pay." (Doc. 26, ¶ 32). Officer Sampson has provided no evidence to support either the allegation that policy allows for an increase in pay or that white officers in similar positions routinely receive a higher rate of pay. Officer Sampson cannot establish a prima facie case of discrimination.

### 2. Legitimate, Nondiscriminatory Reasons

Assuming, arguendo, that Officer Sampson could rely exclusively on his status as the only black officer in the department in meeting his burden of establishing a prima facie case of discrimination based on investigations and discipline, the department has presented legitimate, nondiscriminatory reasons for each instance. The department has also articulated a legitimate,

nondiscriminatory reason for Officer Sampson's failure to promote claim. Finally, assuming he could establish a prima facie case based on failure to increase his pay, the department has articulated a legitimate nondiscriminatory reason for this decision, as well. The Court will address each in turn.

### a. Investigations and Discipline

A total of 16 internal investigations have been opened with Officer Sampson as a subject since the filing of his formal complaint against Sergeant Sprayberry in April of 2013. "[A]n employer's selective investigation of an employee in a protected group can support a claim of discriminatory intent." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 997 (8th Cir. 2011); *see also Smith v. Monsanto Chemical Co.,* 770 F.2d 719, 724 (8th Cir. 1985) (noting in dicta that evidence that white employees were not scrutinized the same as plaintiff would be probative on the issue of discriminatory treatment). Although Officer Sampson identified a similarly-situated white employee for only some of these investigations, a short narrative analysis of each reveals that Defendants can articulate a legitimate, nondiscriminatory reason for the investigation.

### i. Internal Complaint 2013-005

This investigation began when Communications Operator Angela McCabe alleged that she suffered harassment and was discriminated against by former Sergeant Don Paul Bales and Officer Sampson. (Doc. 49-17). Ms. McCabe had been accused of starting a rumor about another dispatcher and generally being a difficult employee to get along with in the communications center. Sergeant Bales and Officer Sampson, two of her supervisors, disciplined her on this basis. During the investigation, a "hugging incident" between Officer Sampson and Ms. McCabe that both parties described as "awkward" came to light, but this was found to not rise to the level of sexual harassment. (*Id.*, p. 46). "Rather, it seemed to be an unfortunate and unnecessary act that Corporal

Sampson should be cautioned, counseled and/or trained to prevent any such incidents in the future." (*Id*.). Officer Sampson claimed that Ms. McCabe had numerous job performance issues, but he had limited documentation that backed up this allegation. Ultimately, the "investigation revealed that [Officer Sampson's] actions in dealing with a subordinate employee amounted to a dereliction of duty by failing to properly document the employee's prior transgressions and counseling." (Doc. 49-11, p. 28). As a result of the investigation, Officer Sampson received a written reprimand and documented training. (*Id*.). Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

### ii.     Internal Complaint 2013-011

This investigation began when Separate Defendant Austin Collins accused Officer Sampson of spreading rumors and making derogatory statements about Officer Collins and his wife, as well as threatening Officer Collins. (Doc. 49-20, p. 4). Officer Collins acknowledged that his complaint was based on hearsay. (*Id*.). Officer Sampson responded that he personally told Officer Collins that he perceived that Officer Collins and his wife "hung around with people that did drugs." (*Id*., p. 5). Officer Sampson also "admit[ted] to saying much worse things to [Officer Collins'] face than what was listed here" but "[h]e did not elaborate as to what that was." (*Id*., p. 6). These allegations were "not sustained" and the complaint was closed. (*Id*., pp. 1, 23-26). Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

### iii.     Administrative Determination 2013-006

This investigation began when, during the investigation of Internal Complaint 2013-005, investigators discovered that Officer Sampson and Sergeant Bales had organized a "team building exercise" for employees of the Communications Unit, and overtime was paid out to those who

attended. (*Id.*, ¶ 6). This administrative inquiry was opened, with the purpose of looking into the potential misuse of public funds. Those subject to the investigation were Officer Sampson, Sergeant Bales, Separate Defendant Dean Pitts, and Captain Larry Rannels, who were all supervisors within the Communications Unit. Major Pitts and Sergeant Bales were disciplined with documented oral counseling for the unauthorized expenditure of funds, but Captain Ranells and Officer Sampson were not subject to discipline and the allegations against them were determined to be unfounded. (*Id.*, ¶ 7). Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

### iv. Internal Complaint 2014-001

This investigation began when Ms. McCabe complained that Officer Sampson continually sang a song insinuating that her work product was inadequate, said negative things to her about her husband, told her that he "no longer had any respect for the persons on his [predetermination hearing] board" and that the department was "very prejudice[d]," and accused her of starting a rumor about another officer seeking to get "a vote of no confidence" in Chief Lindsey. (Doc. 49-19, p. 2). When Detective Smithson received the complaint, he and Captain Copeland "provide[d] Ms. McCabe with a portable digital recorder and the direction to record future contacts with Corporal Sampson to try and obtain digital evidence of the alleged comments." (*Id.*, p. 2). Ms. McCabe's allegations were "not sustained" and the investigation was closed. (*Id.*, pp. 1, 34-37). Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

### v. Internal Complaint 2014-008

This investigation began when Officer Sampson's attorney (also counsel in the instant case) published the identity of an undercover officer. Officer Sampson was investigated to

determine whether he released confidential information without authorization. The investigation "[d]id not produce any evidence or testimony that led to a suspect" and was closed as "not sustained." (Doc. 49-21, p. 1). Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

### vi. Administrative Determination 2014-011

This investigation began when allegations were made that Officer Sampson posted numerous comments on Facebook that were highly critical of the department and its members. Officer Sampson was investigated to determine whether he had violated a number of rules aimed primarily at requiring officers to refrain from publicly criticizing the department and to treat coworkers with respect. (Doc. 49-22, pp. 2). Some of the postings were nothing more than links to articles from local publications or were written by Officer Sampson's attorney. Other posts referred to "tax sucking criminal officers" or "liars, criminals and immoral hypocrites," and accused the department of "corruption and shameless abuse of public trust." (*Id.*, pp. 24, 28, 30). Based on Officer Sampson's social media posts, Chief Lindsey suspended Officer Sampson for 80 hours without pay, but Officer Sampson filed an appeal and the discipline imposed was ultimately reduced to oral counseling.[10] (Doc. 49-11, ¶ 10). Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

---

[10] Sergeant Bales was also disciplined as part of this investigation, with a suspension of 40 hours without pay. He also appealed his suspension to the Civil Service Commission, who first heard his case and determined that all department members deserved training regarding the Fort Smith Police Department's social media policy. In light of this decision, the Civil Service Commission reduced Bales' suspension to oral counseling. Chief Lindsey agreed to reduce Officer Sampson's suspension to oral counseling based on the same reasoning, and Officer Sampson dropped his appeal. (Doc. 49-11, ¶ 10).

### vii.     Internal Complaint 2014-016

This investigation began when Officer Andrew Adams complained that he had recently reported to Officer Sampson that Officer Adams and others on his shift were concerned that Dispatcher Janie Lasiter was creating an unsafe working environment for officers because she could not keep up with the officers' locations and information. (Doc. 49-23, p. 2). In response, Officer Sampson—a Communications Unit supervisor—allegedly stated that "there was nothing he could do because of all the stuff that was going on involving him and Sergeant Bales." (*Id*.). Presumably, Officer Sampson's alleged comments were in reference to ongoing state litigation at that time. Officer Sampson had no recollection of such a conversation with Officer Adams. (*Id*., p. 4). Because of the conflicting stories between the two officers directly involved in the alleged conversations, there was not enough evidence to substantiate or refute either party's story and the matter was closed as "not sustained." (*Id*., p. 5). Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

### viii.     Administrative Determination 2015-003 and Citizen Complaint 2015-009

These related investigations began when a citizen made a complaint against Officer Sampson.[11] By this point, Officer Sampson had transitioned to the role of Information Desk Officer. The complaining citizen was fulfilling a sentence of community service by cleaning the men's bathroom at the Fort Smith Convention Center. She called the information desk and advised that a male supervisor had exposed himself to her, and the caller stated that she did not want to continue serving with this individual. (Doc. 49-24, p. 1). The following day, the citizen came to the Fort Smith Police Department and complained that Officer Sampson refused to send an officer

---

[11] These investigations are the ones that involve the sole comparator described in the prima facie case section, above.

to the convention center after she specifically requested one, and also that Officer Sampson had told her she could pick up the police report the next day but that it was not ready when she had arrived.  (*Id.*, p. 9).  She complained that Officer Sampson made unprofessional comments to her.  (*Id.*).  Once Officer Sampson completed the report, the citizen claimed that it was not accurate.  The citizen stated that she had no complaints against anyone but Officer Sampson.[12]  In response, Officer Sampson said that there had been some miscommunication during the call, but he had told the citizen the report would require 48 hours and also offered to send an officer out to the convention center but the citizen only wanted to have her community service changed.  (*Id.*, p. 12).  During the investigation, Captain Copeland became concerned that Officer Sampson was not being truthful and reported to Chief Lindsey on discrepancies between the recorded telephone call to the Information Desk and what Officer Sampson had told investigators.  (Doc. 49-7, p. 6).  An administrative inquiry was thereafter opened.  (*Id.*).  Chief Lindsey ultimately concluded that Officer Sampson's "handling of the citizen's request for services was woefully inadequate," but that the "circumstances under which [Officer Sampson] received information from coworkers and ultimately from the complainant became so convoluted" that no discipline would be imposed and the investigations were closed as "not sustained." (Doc. 49-24, p. 66).  Defendants have articulated a legitimate, nondiscriminatory reason for these investigations and their results.

### ix.    Administrative Determination 2015-013

This investigation began when an officer was not made aware of a subpoena until the date of the hearing the officer was compelled to attend.  (Doc. 49-25, p. 1).  Officer Sampson signed

---

[12] Two weeks prior, the same citizen also believed that a report completed by Officer Leavitt was inaccurate, but she did not seek to file a complaint against him nor did she believe he falsified the report on purpose.  (Doc. 49-7, ¶ 13).  The matter was apparently resolved at that time to the citizen's satisfaction by allowing her to write a witness statement that was included in the report.  (*Id.*).

for service of the subpoena seven days beforehand. (*Id*.). Officer Sampson placed the document in the "Patrol box" on the back counter of the Information Desk, from which it was not removed until the day before the hearing. (*Id*., p. 2). Officer Sampson was not disciplined, and the investigation was administratively closed with the determination that an operational memo or some type of training would be given to clarify procedures and prevent the situation from happening again. Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

### x.  Citizen Complaint 2015-024

This investigation began when a citizen complained that Officer Sampson was unprofessional when speaking with the citizen over the phone. After listening to the phone conversation, the investigator "did not find Sampson saying anything excessively rude or inappropriate" and the matter was closed as unfounded. (Doc. 49-26, p. 3). Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

### xi.  Administrative Actions 2015-078 and 2015-095

These similar investigations began after two citizens reported individuals as missing. Department protocol required that a "Missing Person" report be filed in response, but Officer Sampson instead sent out a "Be On the Lookout" notice on each occasion. (Docs. 49-27, 49-28). Officer Sampson received oral counseling on the policy and each matter was closed. Defendants have articulated a legitimate, nondiscriminatory reason for these investigations and their results.

### xii.  Administrative Determination 2016-018

This investigation began as a result of Officer Sampson's interaction with several citizens at the Information Desk. (Doc. 49-29, p. 1). Apparently, an exchange involving Officer Sampson "got heated" with parties "yelling back and forth at each other." (*Id*.). The citizens contended that

Officer Sampson told them "[h]e didn't care if [another individual] came over and burned the house down." (*Id*.). Officer Sampson could not remember verbatim what he had said, but he "admitted the situation was frustrating." (*Id*., p. 2). Because there was no audio or video to review of the incident, the complaint was cleared as "not sustained. (*Id*., pp. 4-5). Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

### xiii. Citizen Complaint 2016-024

This investigation began when a citizen filed a complaint against Officer Sampson based on comments the citizen believed were unprofessional. He alleged that Officer Sampson told him "this is my house" and intimidated him. (Doc. 49-30, p. 1). This complaint was cleared as "not sustained" and no discipline was imposed. Defendants have articulated a legitimate, nondiscriminatory reason for this investigation and its results.

### b. Failure to Promote

Defendants have articulated a legitimate, nondiscriminatory reason for passing over Officer Sampson when promoting officers in 2012 and 2013. The Fort Smith Police Department employs both an objective and subjective component to its promotional testing. Officers who score sufficiently high on the objective portion proceed to a subjective portion. On the subjective portion, both the top and bottom scores are dropped from consideration. In 2012, Officer Sampson finished sixth out of twelve applicants on the objective multiple-choice portion of the testing and second out of twelve on the subjective oral examination. This resulted in him finishing fourth overall. Two promotions to Sergeant were made that year, both on the same day, and the officers selected were those who had the top two scores on the exam. The two officers who were promoted had total scores of 164.33 and 159.00. The next highest-scoring officer had a total score of 157.17, and was not promoted in 2012. Officer Sampson's total score that year was 157.00. One of the

two officers selected for promotion scored 5 points higher than Officer Sampson on the objective portion of the test and 3 points lower on the subjective portion, and the other officer scored 1 point lower than Officer Sampson on the objective portion but 8.33 points higher on the subjective portion. (Doc. 49-36). While Officer Sampson was only 0.17 points below the third-ranked scorer, and under department policy the Chief of Police could technically have made the first promotion from the three top-scoring candidates and then selected Officer Sampson (who would at that point have had the third-highest score) to fill the second position, he instead chose to promote the officers with the highest overall scores.

In 2013, Officer Sampson scored fourth overall on the exam. He scored second out of twelve applicants on the objective portion of the exam and tied for fourth on the subjective portion. Three promotions to Sergeant occurred at separate points in 2014 on the basis of these 2013 exam scores, and again the officers selected were those who had the top overall scores on the exam. Officer Sampson's objective score was 1 point higher and his subjective score 8 points lower than the top-scoring officer. His objective score was 4 points higher and his subjective score 6.3 points lower than the second-highest-scoring officer. His objective score was 2 points lower and his subjective score was 1 point higher than the third-highest-scoring officer, who was also the third-highest-scoring officer on the 2012 exam. While the Chief of Police could have selected Officer Sampson for promotion for either of the later two promotions that were available in 2014, he again chose to promote those officers with the highest overall scores.

Defendants have articulated a legitimate, nondiscriminatory reason for promoting other officers than Officer Sampson—Chief Lindsey's consistent policy of selecting the available candidate with the highest overall score for promotion.

### c.      Failure to Increase Pay

Assuming that Officer Sampson could have established a prima facie case of discrimination based on Defendants' decision not to increase his pay when he became Assistant Communications Center Supervisor, Defendants have articulated a legitimate nondiscriminatory reason for the decision. Department Policy & Procedure 1101.24(III)(A)(3) states in relevant part that:

> At times, it becomes necessary to assign a sworn officer who does not hold a supervisory rank to [Assistant Communications Center Supervisor]. When the Assistant Communications Center Supervisor holds a rank below that of sergeant, this position shall be considered a specialized assignment. Regardless of rank, the Assistant Communications Center Supervisor shall have the full *authority and responsibility* of a supervisor holding the rank of sergeant while performing these duties.

(Doc. 54-1, ¶ 12) (emphasis added). This policy does not provide for an increase in pay; rather, it simply allows an officer who has not yet attained the rank of Sergeant to have an increase in "authority and responsibility." Defendants have articulated a legitimate, nondiscriminatory reason for their decision not to increase Officer Sampson's pay.

### 3.      Pretext for Unlawful Discrimination

### a.      Investigations and Discipline

Again assuming Officer Sampson had established a prima facie case, because Defendants have satisfied the second prong of the *McDonnell Douglas* framework, Officer Sampson must show that their offered reasons are pretext for discrimination. "To succeed in showing pretext [ ] the employee 'must provide some evidence that other employees were not subject to the same level of investigation for similar conduct.'" *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 798 (8th Cir. 2011) (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 997–98 (8th Cir. 2011)); *see also Stone v. McGraw Hill Fin., Inc.*, 2017 WL 2041962, at *5 (8th Cir. May 15, 2017). Officer Sampson has not provided any evidence of other officers not being subject to the same

type level of investigation for the same type of conduct as him. To the contrary, he notes that several of the officers involved in Officer Sampson's investigations "have ongoing investigations regarding their own dishonesty…" (Doc. 54, p. 3). A number of the investigations in which Officer Sampson was a subject included additional officers. While the number of investigations in which Officer Sampson was involved is substantial, the reasoning for each of them was certainly justified. Officer Sampson's transition to the Information Desk also appears to have made him more susceptible to investigations, as that position involves constant interaction with citizens as one of the most readily-available members of the department.

Officer Sampson attempts to establish pretext for each of his claims by calling into question the credibility of Chief Lindsey, Captain Copeland, Major Pitts, Major Hallum, Sergeant Sprayberry, Sergeant Bowers, and former Major Chris Boyd. He points out that Chief Lindsey resigned from the department after commenting in the presence of an African-American city employee about how he would make undisclosed individuals happier if he were in "blackface." (Docs. 54-1, 56-2). For Captain Copeland, Plaintiff argues that he is dishonest and notes that an investigation was opened to determine Captain Copeland's truthfulness. According to the current Chief of Police, "there was no veracity to the allegations that Captain Copeland was untruthful," the investigation was concluded, and the matter was deemed "unfounded." (Doc. 56-1, ¶ 5). Major Pitts allegedly made a racist joke in the presence of Sergeant Bales. (Doc. 54-1, ¶ 7). Major Hallum allegedly contacted a member of the Civil Service Commission to have a black applicant for the police force disqualified from hiring. (*Id.*, ¶ 11). Also according to Sergeant Bales, Sergeant Sprayberry spoke to Officer Sampson in a demeaning and inappropriate manner but would not do the same to white officers. (*Id.*, ¶ 10). Officer Sampson also alleges that Sergeant

Bowers has a confederate flag tattoo and Major Boyd had pictures of confederate Civil War officers in his office.

There is no place in a civilized society for some of the racially charged comments alleged. Yet, "isolated comments that are remote in time and not related to the employment decision are insufficient to establish pretext for discrimination." *Erenberg v. Methodist Hosp.*, 240 F. Supp. 2d 1022, 1033 (D. Minn. 2003), *aff'd*, 357 F.3d 787 (8th Cir. 2004). Officer Sampson has not produced any evidence that establishes a question of fact with respect to the legitimacy of any of the aforementioned investigations or the discipline handed out in the few instances that it was. He relies upon a handful of comments unrelated to his insufficient prima facie case of discrimination to argue that pretext has been shown. The majority of investigations into Officer Sampson were the result of complaints from citizens or individuals within the department who are not involved in this lawsuit. While the specific officers upon whom he relies in making his argument for pretext certainly played a part in the investigations that followed, the only discipline that was ultimately imposed on Officer Sampson as a result of those investigations amounted to oral counseling, a written reprimand, and documented training. Officer Sampson has not shown pretext for unlawful discrimination, and his claim of discrimination based on investigations and discipline fails.

### b.     Failure to Promote

Because Defendants have articulated a legitimate, nondiscriminatory reason for the decision not to promote Officer Sampson after the 2012 and 2013 examinations, the burden shifts to him to put forth sufficient evidence from which a jury could find that Defendants' articulated reason was pretext and the true reason for the decision not to promote Officer Sampson was unlawful discrimination. Officer Sampson attempts to meet this burden by relying on the affidavit of Sergeant Barnett, who states that the promotional tests have been "manipulated for years,

whereby higher-ranking officers would give the questions and answers to certain white corporals ahead of time in an effort to ensure that favored corporals were promoted." (Doc. 54-2, ¶ 4). The Court finds that no reasonable juror could conclude such testimony is sufficient to establish that the articulated reason is pretext for unlawful discrimination.[13] *See Anderson v. Durham D & M, LLC*, 606 F.3d 513, 522 (8th Cir. 2010) ("Although an employer's violation of its own policies may be indicative of pretext, that is not always so."); *see also McCullough v. Univ. of Ark. for Med. Scis.,* 559 F.3d 855, 863 (8th Cir. 2009) ("An employer can certainly choose how to run its business, including not to follow its own personnel policies... as long as it does not unlawfully discriminate in doing so."). However, considering this affidavit in the light most favorable to Plaintiff, all it might reasonably establish is that answers were given ahead of time so that "favored corporals were promoted." This does not show that Officer Sampson was passed over due to racial discrimination; rather, it simply implies that he was not a "favored corporal." The vast majority— if not all—of the other applicants for promotion were not members of a protected class. As Officer Sampson acknowledges, a number of white officers also were passed over for promotion in both 2012 and 2013. (Doc. 54, p. 7). Sergeant Barnett's affidavit does not state that all white corporals applying for promotion received the answers ahead of time. Instead, it states only that the "favored" officers received the answers, regardless of their race. This is insufficient to prove pretext for racial discrimination. *See Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) ("[B]ecause Title VII is premised on eliminating *discrimination,* inappropriate conduct that is

---

[13] The Court notes that in 2013, Officer Sampson finished second on the written portion of the test. If the objective portion of the test were being manipulated to exclude nonwhite officers from promotion, then more white officers presumably should have scored higher than Officer Sampson.

inflicted on both sexes, or is inflicted regardless of sex, is outside the statute's ambit." (emphasis in original)).

"[T]o support a finding of pretext, [Officer Sampson] must show that [Defendants] hired a *less* qualified applicant." *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004) (citing *Duffy v. Wolle,* 123 F.3d 1026, 1037 (8th Cir. 1997)) (emphasis in original). Based on its promotional testing, the Fort Smith Police Department hired the most qualified applicant—individuals who were thus *more* qualified than Officer Sampson—each time there was an opportunity to promote someone to Sergeant in both 2012 and 2013. Therefore, Officer Sampson cannot establish that the reason offered for promoting others is pretext for racial discrimination, and Defendants are entitled to judgment on his failure to promote claim.

### c.      Failure to Increase Pay

Officer Sampson cannot meet his burden to show Defendants' articulated reason for not increasing his pay when he was Assistant Communications Center Supervisor was pretext for unlawful discrimination. The affidavit of Sergeant Bales makes the conclusory declaration that a pay increase is authorized by policy for Assistant Communications Center Supervisor. (Doc. 54-1, pp. 2–3). The actual policy identified by Defendants in articulating their legitimate nondiscriminatory reason does not support Sergeant Bales's conclusion. Officer Sampson does not otherwise offer evidence that white officers who received effective promotions for special assignments were given an increase in pay, and he cannot show that Defendants' articulated reason was pretext for unlawful discrimination. Judgment against him is proper on this basis.

### C.      Retaliation

Officer Sampson claims that Defendants retaliated against him for both filing a complaint with the EEOC and opposing harassment or discrimination by filing the formal complaint against

Sergeant Sprayberry. As a result of engaging in these protected activities, Officer Sampson specifically alleges that Defendants retaliated against him through the aforementioned investigations. (Doc. 26, ¶ 89, 97).

To establish a prima facie case of retaliatory discrimination under Title VII, a plaintiff must show (1) that he engaged in protected activity; (2) that the defendant took an adverse employment action against him; and (3) that but for his protected activity, the defendant would not have taken the action against him. *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 632 (8th Cir. 2005); *see also Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737-38 (8th Cir. 2013) (explaining a plaintiff must show that retaliatory animus was the determinative "but for" cause of the adverse action, rather than merely a motivating factor). The plaintiff need make only a minimal showing to establish a prima facie case before the burden of production shifts to the employer. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002). Officer Sampson likely engaged in two courses of protected activity, and, as previously mentioned, a factfinder could determine that the subsequent investigations in which Officer Sampson was a subject were adverse employment actions. However, Officer Sampson fails to meet his prima facie burden because he cannot meet the "but for" causation element. *See Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016) ("It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90–91 (2d Cir. 2015))).

Sixteen investigations in which Officer Sampson was a subject were opened during the relevant time period. Out of those, seven of the eight most recent investigations started as a result of citizen complaints and direct communications with those citizens while serving at the Information Desk. As previously noted, the department has a duty of investigating every citizen complaint. Of the remaining nine, Officer Sampson was the lone subject in just three of them.

Additionally, Officer Sampson was only disciplined after two of the remaining nine investigations—with a written reprimand and oral counseling. White officers were disciplined as a result of three of those nine remaining investigations, with Officer Sampson not receiving discipline in two of those three cases. Officer Sampson has not cited any specific materials from which a reasonable factfinder could conclude that retaliation was the "but for" cause in these investigations being opened and the disciplined imposed by them.

Even if Officer Sampson had met his burden of showing a prima facie case, Defendants have come forward with a legitimate, nondiscriminatory reason for each of the sixteen investigations. As stated above, Officer Sampson cannot show that the articulated reasons are pretextual. Temporal "proximity alone is insufficient to establish pretext." *Gibson v. Geithner*, 776 F.3d 536, 542 (8th Cir. 2015). "[T]o prove pretext in a retaliation case, the plaintiff 'must both discredit [the] asserted reason for the [adverse action] and show the circumstances permit drawing a reasonable inference that the real reason for [the adverse action] was retaliation.'" *Pedersen v. Bio–Med. Applications of Minn.*, 775 F.3d 1049, 1055 (8th Cir. 2015) (quoting *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 918 (8th Cir. 2007)). Officer Sampson cannot accomplish either of these requirements, and he has not pointed to any materials in the record from which pretext for retaliation could reasonably be inferred. Judgment for Defendants is appropriate on Officer Sampson's Title VII retaliation claims.

### D.  Section 1983 and ACRA claims

In his § 1983 and ACRA claims, Officer Sampson alleges that his reputation and employment were deprived without due process or equal protection as required by the Fourteenth Amendment, and that his First Amendment rights were similarly violated because his anti-discrimination complaints were motivating factors in the retaliatory actions taken against him. The

§ 1983 property claims and the ACRA claims are analyzed under the same *McDonnell Douglas* analytical framework as the Title VII discrimination and retaliation claims. *Richmond*, 957 F.2d at 598; *Greenlee*, 342 S.W.3d at 277–79; *Brodie*, 2012 WL 90016 at *2. They fail for the same reasons. Officer Sampson has not provided any evidence of a prima facie case for unconstitutional deprivation of his reputation and employment without due process.

To succeed on his First Amendment retaliation claim, Officer Sampson must show first that he spoke as a citizen on a matter of public concern, rather than as an employee. *Garcetti*, 547 U.S. at 418. If he can make this showing, then he must show that Defendants had no adequate justification for treating him differently from any other member of the general public. *Id.* "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. Officer Sampson's internal complaints appear to have been personal in nature and made as an employee rather than as a citizen. It is not clear that he could show he was speaking as a citizen on a matter of public concern. Even if he could, the various bases for each of Defendants' investigations into Officer Sampson and any resulting disciplinary actions demonstrate that Defendants had an adequate justification for treating Officer Sampson differently from any other member of the general public—the investigations stemmed from potential violations of workplace policies. Officer Sampson has not adequately supported his First Amendment retaliation claims with citation to materials in the record, and judgment against him is proper.

IV. **Conclusion**

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment (Doc. 49) is GRANTED. Plaintiff Wendell N. Sampson, Jr.'s claims are DISMISSED WITH PREJUDICE.

Judgment will be entered accordingly.

IT IS SO ORDERED this 8th day of June, 2017.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE